UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| KAJUAN PASCHAL,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | Case No. 18-cv-01932-RMI<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 18, 23 |

Plaintiff, Kajuan Paschal, received supplemental security income ("SSI") disability payments under Title XVI of the Social Security Act as a child; and, upon reevaluation of his eligibility when he turned 18, a finding was entered that he was no longer disabled as of July 1, 2014. Plaintiff now seeks judicial review of the administrative law judge ("ALJ") decision that denied him continuing SSI benefits. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 9, 11), and both parties have moved for summary judgment (dkts. 18, 23). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal

error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**SUMMARY OF THE RELEVANT EVIDENCE**

Plaintiff raises five issues, four of which are interrelated. Plaintiff's related issues argue that the ALJ committed reversible legal error by improperly rejecting the opinions of treating and examining sources; by improperly rejecting Plaintiff's symptom testimony; by formulating a residual functioning capacity ("RFC") not based on substantial evidence; and by relying on vocational expert ("VE") testimony based on an incomplete hypothetical. *See* Pl.'s Mot. (dkt. 18) at 5 11-21. Accordingly, the following is a summary of the evidence relevant to the disposition of those claims.

*Evidence from Treating and Examining Doctors*

By way of background, Plaintiff was approximately 21 years old at the time of the hearing before the ALJ, and was living with his grandmother in Alameda County, California. *Id*. at 6. Growing up, Plaintiff received intermittent psychiatric treatment and special education services for a number of years due to cognitive and behavioral problems; further, he attended an alternative high school due to his inability to function in the standard high school setting. *Id*.; *see also AR* at 384, 386, 519-20. As an adult, Plaintiff has been assessed with PTSD, mood disorder not otherwise specified, disruptive disorder, adjustment disorder, and learning disability. *Id*.; *see also AR* at 78, 380, 383, 385, 449-53, 519, 526, 621-36. As discussed in detail below, Plaintiff's mental impairments have been found to result in marked difficulties in his ability to understand, remember, or apply information, and as well as his ability to concentrate, persist, or maintain pace.

*See AR* at 629.

Plaintiff submits that he was treated by Micheline Beam, Ph.D., for a three-month period between October of 2014 and January of 2015, and that "Dr. Beam noted Plaintiff's depression, anxiety, aggression, and conflict with his family . . . [and] his depressed mood [which] is present most of time, [] causes him to withdraw, isolate, and if triggered, become angry." Pl.'s Mot. (dkt. 18) at 7 (citing *AR* at 518-19, 526-30). Plaintiff adds in this regard that Dr. Beam diagnosed him with a mood disorder not otherwise specified and a learning disorder not otherwise specified. *Id*. at 16 (citing *AR* at 518, 526). This appears to have been the sum of the evidence related to this witness, as Plaintiff makes no other references to Dr. Beam.

In any event, Plaintiff was referred for consultative psychological examinations on two occasions. The first evaluation was performed by Jodi D. Snyder, Psy.D., in May of 2014, at the request of the state agency for disability determination and review, and which Dr. Snyder described as an "evaluation [that] was limited in scope and based on a single, time-limited session." *AR* at 449-50. Initially, Dr. Snyder noted that Plaintiff presents as a slow learner, and as someone with difficulties with comprehension, focus, attention, and following written and spoken instructions. *Id*. at 449. Dr. Snyder added that Plaintiff had never worked and that he reportedly received $876.00 per month in SSI payments, which were managed by his grandmother on his behalf. *Id*. at 450. As part of this evaluation, Dr. Snyder completed an independent psychological examination and administered a series of diagnostic tests including the Folstein Mini Mental Status Exam ("MMSE"), the Wechsler Adult Intelligence Scale (4th Ed.) ("WAIS-IV"), the Wechsler Memory Scale (4th Ed.) ("WMS-IV"), as well as both parts of the trail making tests. *Id*. Following the administration of these tests, Dr. Snyder reported that Plaintiff's full-scale IQ score was 70, placing him in the borderline range of intellectual functioning. *Id*. at 451. Specifically, Plaintiff's WAIS-IV processing speed was measured at 68, or in the extremely low range, where he was measured at the borderline range in verbal comprehension, perceptual reasoning, and working memory. *Id*. As to his memory, Plaintiff's WMS-IV scores showed that his auditory memory operated in the extremely low range of functioning. *Id*. Dr. Snyder then opined that Plaintiff was moderately to severely impaired in his ability to follow complex instruction or

3

complete complex tasks, but that he was moderately impaired in his ability to adapt to changes in job routine. *Id*. at 452. By way of prognosis, Dr. Snyder cautioned that "Claimant appears to have difficulty with his cognition [which] appears primarily medical therefore [I] will defer to [a] medical opinion." *Id*. Lastly, Dr. Snyder opined that Plaintiff does not have the ability to manage funds. *Id*. at 453.

Plaintiff's second evaluation, performed as a result of a referral from his counsel, was undertaken by Elizabeth Pearce, Psy.D. and Sonia Reyes-Tena, M.A., over the course of three days at the Hume Behavioral Health and Training Center in December of 2016. *Id*. at 621. Dr. Pearce's assessment procedures were thorough, resulting in a 16-page report. *Id*. at 621-36. Plaintiff appeared for testing and evaluation on December 13th, 20th, and 27th of 2016, such as to allow Dr. Pearce time for separate clinical interviews with Plaintiff and his grandmother, as well as a review of Plaintiff's school records and the administering of the following diagnostic tests: the WAIS-IV, the Dot Counting Test, the Montreal Cognitive Assessment ("MoCa"), the California Verbal Learning Test (2nd Ed.) ("CVLT-II"), the Personality Assessment Inventory ("PAI"), the Rey Complex Figure Test ("RCFT"), the Ruff 2 and 7 Selective Attention test, the Test of Memory Malingering ("TOMM"), and the Wide Ranging Achievement Test (4th Ed.) ("WRAT-4"). *Id*. at 621.

Dr. Pearce described Plaintiff's psychological history as being shaped in large part by the fact that Plaintiff had experienced the loss of "several friends and family [members] being shot or dying." *Id*. at 622. This started when Plaintiff "was younger [and] saw one of his close friends in the hospital after he sustained a bullet wound," after which Plaintiff would be perpetually preoccupied with his safety. *Id*. Dr. Pearce also noted that Plaintiff was admitted to special education services from the 8th grade onwards due to his deficits in auditory processing. *Id*. After eventually finishing high school, Plaintiff briefly worked as a "store courtesy clerk," and while Plaintiff reported that "he left the job because he did not like the pace of the job," his grandmother reported that he was in fact fired because he could not keep up with the pace of the job. *Id*. Dr. Pearce also noted that her review of Plaintiff's medical records reflected diagnoses of various mental health disorders including generalized anxiety disorder, disruptive behavior disorder not

4

otherwise specified, and mood disorder not otherwise specified. *Id*. When she asked Plaintiff about how he was affected by the violence of which his friends and family had been victims, Plaintiff reported to Dr. Pearce that he constantly wondered why he was still alive. *Id*. at 623. Dr. Pearce noted that, as a result, Plaintiff "showed an increase of anxious thoughts and behaviors . . . [and] that while he is out of his home he looks over his shoulder frequently, he also ruminates on bad things happening to him or his loved ones." *Id*. Plaintiff's grandmother, Ms. Watson, reported to Dr. Pearce that Plaintiff had largely withdrawn himself from the society of his peers, and that Plaintiff would generally avoid leaving the home alone, "unless someone comes and takes him out." *Id*. (internal quotation marks omitted). Regarding his daily functioning, Ms. Watson reported to Dr. Pearce that Plaintiff occasionally forgets having put a pot on the stove, and only remembers when the house becomes filled with smoke. *Id*. Consequently, Ms. Watson "encourages him to mak[e] quick and easy meals (e.g., sandwiches) . . . [beause] his attention span is limited and varies between 2 or 3 minutes for most tasks." *Id*. Ms. Watson also reported to Dr. Pearce that Plaintiff can be forgetful to the point that "his grandmother typically needs to remind him of appointments." *Id*. 623-24.

Dr. Pearce also made a series of behavioral and mental status observations; initially, she found confirmation of Ms. Watson's statements about her grandson's need to be reminded about appointments by observing that Plaintiff arrived approximately an hour late for two of the three evaluation sessions. *Id*. at 624. Observing that Plaintiff "exhibited a flat affect," Dr. Pearce added that "[t]hroughout the sessions he tapped his feet, shifted in his chair, and tapped his hands (or pencil) while completing different tasks." *Id*. Regarding the results of the diagnostic testing, Dr. Pearce found that Plaintiff's performance on the Dot Counting Test, which measures response effort, fell outside the range of normal effort even when compared to a group of individuals with learning disability. *Id*. at 625. Plaintiff's full-scale IQ was measured by Dr. Pearce as 81, suggesting overall intellectual functioning in the low-average range. *Id*. In this regard, Dr. Pearce found that Plaintiff showed impairment in the executive functioning aspects of language. *Id*.

Plaintiff's short-term memory was evaluated as "significantly impaired with his immediate visual memory score falling below the 1st percentile," while his delayed memory appeared to be

5

mildly impaired, placing him in the 4th percentile. *Id*. at 626. Dr. Pearce noted that on the MoCA, Plaintiff's "performance was severely impaired on a memory task [when] [h]e recalled [only] one of the five words on the list during the free recall." *Id*. Likewise, as a result of his performance on the CVLT-II, a measure of auditory learning, Plaintiff's "performance was in the significantly impaired range" on short and long delayed free recall conditions, "where he was asked to state as many of the words he could remember from the list spontaneously." *Id*. Dr. Pearce's overall conclusion as to Plaintiff's memory deficits was that he "has moderate to severe impairment in retrieval of verbal information . . . [which] appear to be consistent with the report of both Mr. Pascal and his grandmother about his inability to remember appointments and remember what he has been working on at that point of time." *Id*. at 627. In areas of executive functioning, Dr. Pearce found that Plaintiff had "significant difficulties completing a clock drawing task on the MoCA," and that his performance was impaired on another portion of the MoCA, the Alternating Trail Making section, due to his inability to shift between numbers and letters. *Id*. Further, as to Plaintiff's ability for visual scanning, discrimination, and motor skills, Dr. Pearce found that his performance on the Ruff 2 and 7 Tests of Selective Attention showed mild to moderate impairment. *Id*.

Dr. Pearce then discussed Plaintiff's performance on the emotional and personality tests administered. In this regard, Dr. Pearce began by noting that Plaintiff's "[e]valuations on somatic symptoms scales appear to be consistent with [Plaintiff]'s documented medical history . . . reflect[ing] anxiety, stress, and feelings of persecution . . . [coupled with] an elevation on the traumatic stress scale, which seem consistent with his report of witnessing violence and deaths in proximal social groups." *Id*. Dr. Pearce added that Plaintiff's responses on the Personality Assessment Inventory "also indicated that he has difficulty sleeping, is unable to manage time effectively, and has difficulty maintaining patience and attention," further opining that "[a]ll these factors may be related to his repeated exposure to violence and death." *Id*. at 627-28. Accordingly, Dr. Pearce diagnosed Plaintiff with PTSD and noted his "recurrent intrusive thoughts and memories about the violent deaths and injuries of his friends and family members, and about the manner in which they died . . . presently, [he] avoids external reminders of the traumatic events, as

6

evidenced by withdrawing into his home." *Id*. at 628. Dr. Pearce explained that Plaintiff's "symptoms cause clinically significant distress and impairment in social and occupational functioning." *Id*.

As to the specifics of Plaintiff's limitations in social and occupational functioning, Dr. Pearce opined that Plaintiff has marked impairment in his ability to understand, remember, or apply information; marked impairment in his ability to concentrate, persist, or maintain pace; moderate to marked impairment in "adapting and managing himself in situations"; and mild to no impairment in his ability to interact with others. *Id*. at 628-29. Dr. Pearce added that Plaintiff's performance on the cognitive tests is consistent with his grandmother's reports that Plaintiff often tells stories that are not sequenced properly, or that misinterpret the events, as well as being consistent with the reports that Plaintiff frequently misinterprets events, leading him to become distressed. *Id*. at 629. As to his limitation with attention, Dr. Pearce noted that Plaintiff's limitation in this regard should be expected to fluctuate somewhat as it is influenced by his exposure to traumatic events that cause him to be hyper-vigilant, making it more difficult for him to avoid distractions in certain settings. *Id*. at 630. In Dr. Pearce's opinion, Plaintiff also "appears to have difficulty managing activities of daily living such as cooking, cleaning up after himself and managing his schedule," while still being able to "independently complete tasks such as navigating public transportation and attending to basic hygiene." *Id*. Plaintiff's difficulty in maintaining his concentration and difficulty with switching tasks would, in Dr. Pearce's opinion, combine to hinder and frustrate Plaintiff's ability to function in a work setting. *Id*. Additionally, Dr. Pearce found that Plaintiff's "symptoms would have a direct impact on his ability to attend to his job on a regular basis (and on time), as well as being able to follow schedules in some settings . . . [and that] his need to filter for threatening situations and respond[] to them, would likely lead him to be unable to adequately respond to unexpected situations." *Id*. In sum, Dr. Pearce concluded that Plaintiff's symptoms: (1) interfere with his ability to complete longer hours on tasks; (2) hinder his retrieval of both auditory and visual information, leading to misinterpretation and misinformation; (3) hinder his ability to read and comprehend information; (4) cause him to need marked assistance from his social support group to accomplish simple tasks such as keeping

7

appointments and cooking for himself; and, (5) "impair[] his social, cognitive, and daily functioning, limiting his ability to seek and acquire a job or perform job-related duties at this time." *Id*. at 631.

*Medical Evidence from Non-Examining Source*

Nearly two years before Dr. Pearce's evaluation, on February 20, 2015, R. Ferrel, M.D., completed a pre-printed form as to Plaintiff's functional limitations based, presumably, on a review of Plaintiff's medical records. *Id*. at 545-48. While the form does not indicate the basis for the opinion, or any explanation, Dr. Ferrell nevertheless opined that Plaintiff was only moderately limited in his ability to understand and remember detailed instruction, and not significantly limited in other areas of understanding and remembering. *Id*. at 545. Dr. Ferrell also opined that Plaintiff is moderately limited in his ability to execute detailed instructions, to maintain concentration for extended periods, to set goals and make plans, to respond appropriately to changes in the work setting, to accept instructions and respond appropriately to criticism, and to complete a normal workday without symptom-based interruptions and at a reasonable pace. *Id*. at 545-46. These opinions were expressed as checked boxes on a pre-printed form, to which the following single sentence of original text was added, "[Claimant] is capable of performing simple tasks with limited peer/public contact." *Id*. at 547.

*Hearing Testimony*

A few months after the evaluation performed by Dr. Pearce, Plaintiff appeared for a hearing before the ALJ. *See id*. at 36-69. During the course of the hearing, Plaintiff was intermittently questioned by his counsel and the ALJ. Plaintiff was first asked about the loss of his friends and family members, and reported that there had been no fewer than six funerals for those close to him in the few months preceding the hearing, and that going back a bit longer, the number was closer to a dozen. *Id*. at 40-41. When asked why he didn't like to play sports anymore, Plaintiff reported that "[m]y freshman year of high school, I was playing football - - me and my friend, one that got killed. And after he got killed, I really lost interest in sports." *Id*. at 42. Plaintiff was then asked to explain why he would so often get in trouble when he was in school, and responded that "I'd say like, getting along with my peers. Like - - so, like, my anger and self-

8

control. Like a lot of stuff. Like, I would say, like, communication skills, I would say." *Id*. at 43. The ALJ then asked Plaintiff what the consequences would be for his bad behavior during adolescence; Plaintiff appears to have become agitated by the question, responding that "I came from nothing. So, there wasn't nothing they can take from me . . . I have no punishments. I grew up as punishment. I had nothing, so, you know what I'm saying . . . we come from two different places . . . [y]ou were raised different from what I was raised, you know what I'm saying?" *Id*. at 51-53.

With that, the ALJ turned to questioning the vocational expert ("VE"), first confirming that Plaintiff had no past relevant work, and then asking the VE whether there would be any employment for a hypothetical person of Plaintiff's age and education who could perform medium work that was limited to simple, routine, and repetitive tasks, and that required only occasional decision-making and occasional changes in the work setting. *Id*. at 64. The VE answered in the affirmative and suggested employment as a recycler, a hand packer, and a grocery bagger. *Id*. The ALJ then asked the VE to assume the same hypothetical except adding the "need[] to work in a low-stress job, [] defined[] as only occasional decision-making, only occasional changes in the work setting . . . [and such that] [h]e cannot have any interaction with the general public, and only occasional interaction with co-workers." *Id*. at 66. The VE responded that such a person would still be employable as a recycler or a hand packer. *Id*. at 66.

The ALJ then asked the VE to assume the same hypothetical but adding that the person "would need to work off task for about 10 percent of the day," and the VE responded that such a limitation "would eventually result in unemployment." *Id*. Plaintiff's counsel then asked the VE whether there would be any employment for a person limited to medium work "with moderate limitations - - [] defined as up to a 20 percent reduction - - in the ability to ignore or avoid distractions . . . make plans . . . use reason and judgment . . . adapt to changes . . . [and] be aware of normal hazards and take appropriate precautions." *Id*. at 67. The VE appeared to interpret this question as asking about a person who would be off-task 20 percent of the workday, and responded that being off-task for 20 percent of the workday would render someone unemployable. *Id*. Plaintiff's counsel then asked the VE to assume the same hypothetical, but for someone who

9

would be absent from work two or three days per month – the VE responded that this would exceed acceptable rates of absenteeism. *Id*. Lastly, Plaintiff's counsel asked the VE if there would be any employment for such a person if they were "off-task more than 20 percent - - in [their] ability to work a full day without needing more than the allotted number of rest periods," and, again the VE responded that there would be no employment for such a person. *Id*. at 68.

## THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY

A person filing a claim for social security disability benefits ("the claimant") must show the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[1] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). Most importantly, "the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation process. *AR* at 15-26. At Step One, the claimant bears the burden of showing he has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. Here, the ALJ found that Plaintiff had never engaged in substantial gainful activity since turning 18 in February of 2014. *AR* at 17.

At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'"

---

[1] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

10

*Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: intellectual disorder, PTSD, disruptive disorder, and Crohn's disease. *AR* at 17.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's RFC and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *AR* at 17. Next, the ALJ determined that Plaintiff retained the RFC to perform the full range of medium work, but limited to simple and repetitive tasks, limited contact with the public, co-workers, and supervisors, and limited changes in the work setting. *AR* at 21.

At Step Four, the ALJ determined that Plaintiff had no past relevant work experience; and at Step Five, based on the testimony of the VE, the ALJ determined that Plaintiff is capable of working as a grocery bagger, hand bagger, or recycler; and therefore, that Plaintiff's disability ended on July 1, 2014, and the claimant has not become disabled again since that date. *Id*. at 26.

**ISSUES PRESENTED**

Plaintiff argues that the ALJ erred: by rejecting, in whole or in part, the opinions of Plaintiff's treating and examining doctors; by improperly rejecting Plaintiff's subjective symptom complaints; by formulating an RFC that was not based on substantial evidence; by relying on VE testimony that was based on an incomplete hypothetical; and, lastly, that remand is warranted because the ALJ was not properly appointed to her position. *See* Pl.'s Mot. (dkt. 18) at 5, 11-22.

**DISCUSSION**

Plaintiff's arguments about the flaws in the RFC and improper reliance on VE testimony based on an incomplete hypothetical are intertwined with, and dependent upon, Plaintiff's contention that the ALJ improperly rejected key parts, or the entirety, of the opinions of Plaintiff's treating and examining psychologists. Thus, Plaintiff contends that the ALJ erred by rejecting, in

11

whole or in part, Dr. Beam's opinion, as well as the opinions of the consulting examiners, Dr. Snyder and Dr. Pearce. Plaintiff argues that the ALJ erred by rejecting Dr. Beam's opinion erroneously on the basis that Plaintiff never consistently engaged Dr. Beam for treatment. *Id*. at 15. In this regard, Plaintiff notes that, after three months of treatment, Dr. Beam found that Plaintiff's symptoms, related to the combination of his cognitive and mood disorders, and which are present most of the time, cause him to withdraw and isolate himself, and occasionally result in anger. *Id*. at 7, 16. On the other hand, Dr. Snyder, opined after a single-visit examination that Plaintiff was moderately to severely impaired in his ability to follow complex instructions or complete complex tasks, and but only moderately impaired in his ability to adapt to changes in job routine. *AR* at 452. However, Dr. Snyder's opinion was limited to a psychological perspective and came with a caveat – namely, that Plaintiff's difficulty with cognition appeared to Dr. Snyder to be medical, rather than psychological, in nature; thus, Dr. Snyder's report suggested that a medical opinion might be necessary regarding Plaintiff's cognitive difficulties. *Id*. Nevertheless, she opined that Plaintiff does not have the ability to manage funds. *Id*. at 453. Plaintiff's second psychological evaluation was performed by Dr. Pearce, with the assistance of a practicum trainee. In essence, Dr. Pearce opined that Plaintiff was markedly impaired in his ability to understand, remember, apply information, concentrate, persist, or maintain pace; moderately to markedly impaired in "adapting and managing himself in situations"; and mildly impaired, if at all, in his ability to interact with others. *Id*. at 628-29. This is the essence of the evidence from the treating and examining sources that Plaintiff contends was incorrectly weighed and improperly rejected by the ALJ. *See* Pl.'s Mot. (dkt. 18) at 12-17.

In order to properly reject the un-contradicted opinion of a treating or examining doctor, an ALJ must express clear and convincing reasons that are supported by substantial evidence in the record. *See Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014); *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Further, the ALJ is required to consider a series of factors when determining how much weight to afford the treating physician's medical opinion including: the length of the treatment relationship; the frequency of examination; the

12

nature and extent of the treatment relationship; the supportability of the physician's opinion with medical evidence; and the consistency of the physician's opinion with the record as a whole. *Ghanim*, 763 F.3d at 1161. In cases where a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject the opinion of the treating or examining doctor by providing specific and legitimate reasons that are supported by substantial evidence in the record. *Trevizo*, 871 F.3d at 675; *Bayliss*, 427 F.3d at 1216; *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). An ALJ can satisfy this burden by setting forth a detailed summary of the facts and conflicting clinical evidence, the interpretation thereof, and the resulting findings. *Trevizo*, 871 F.3d at 675; *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

Also, it has "long [been] recognized that the ALJ is not a mere umpire at [an administrative proceeding], but has an independent duty to fully develop the record[.]" *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992, as amended Sept. 17, 1992) (*per curiam*); *see also Sims v. Apfel*, 530 U.S. 103, 110-111 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). Included in this duty to develop the record properly is an obligation for the ALJ to take reasonable steps to ensure that issues and questions raised by medical evidence, particularly evidence from treating physicians, are addressed so that the disability determination is fairly made on a sufficient record of information, be it favorable or unfavorable to the claimant. *See Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); and, *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978); *see also* 42 U.S.C. § 421(h). Thus, an ALJ has not only the power, but a duty, to "conduct an appropriate inquiry" if the evidence is ambiguous or inadequate to permit a proper evaluation of a claimant's impairments. *Smolen*, 80 F.3d at 1288. If evidence from the medical sources is inadequate to fairly determine if someone is disabled, an ALJ may be required to re-contact medical sources as necessary, including a treating physician, to determine if additional needed information is readily available. *See* 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1); *see also*

13

*Webb*, 433 F.3d at 687 ("[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence [or] the ALJ's own finding that the record is inadequate"). The responsibility to fulfill this duty belongs entirely to the ALJ; it is not part of the claimant's burden. *See e.g., White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("This duty extends to the represented as well as to the unrepresented claimant . . . Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry . . . including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record.").

Defendant responds generally by stating that the ALJ properly weighed the evidence and gave good reasons for the weight given to the treating source, and adequately explained the weight given the other sources. *See* Def.'s Mot. (dkt. 23) at 11. Regarding Plaintiff's treating psychologist, Defendant argues that there was no opinion to accept or reject, noting that "Dr. Beam did not offer a RFC questionnaire or other functional assessment of Plaintiff's ability to engage in work-related tasks that the ALJ was required to consider, and Plaintiff does not identify any such opinion." *Id*. at 11-12. The court disagrees. Plaintiff has in fact identified such an opinion in pointing out that Dr. Beam opined that because they are present "most of the time," the symptoms related to his cognition and mood disorders cause Plaintiff to withdraw and isolate himself. *See* Pl.'s Mot. (dkt. 18) at 7 (citing *AR* at 526) ("Depressed mood is present most of the time. As a result, he will withdraw, isolate and if triggered will become angry."). The court finds this to be a clearly expressed opinion by a treating source, as opposed to some errant notation as Defendant contends, because it is explained as the "current signs and symptoms" supporting Dr. Beam's diagnosis for mood disorder not otherwise specified. *See AR* at 526. The ALJ in this case gave "some weight to Dr. Beam's assessment . . . but the claimant never consistently engaged Dr. Beam for treatment, which would have allowed her a longitudinal view of his symptoms." *Id*. at 23. However, because this is all that was said by the ALJ in dealing with Dr. Beam's "assessment," it is only clear by implication (i.e., the RFC in this case) that the ALJ rejected Dr.

14

Beam's opinion about the effect where Plaintiff's symptoms, which are present "most of the time," cause him to withdraw and isolate himself. In any event, a review of the hearing transcript makes it clear that the ALJ did not venture to develop the record in this regard. Moreover, the court finds that the ALJ's failure to mention, and the rejection by implication of Dr. Beam's opinion about the limiting effects of Plaintiff's symptoms, does not constitute a specific, legitimate reason based on substantial evidence in the record. Accordingly, the court finds that the ALJ erred in rejecting Dr. Beam's opinion without providing a specific and legitimate reason.

The ALJ gave "great weight" to Dr. Snyder's opinion about Plaintiff's abilities and limitations – however, the ALJ failed to mention that Dr. Snyder had hedged in her assessment and specifically noted, that a medical examination might be necessary, as Plaintiff's cognitive difficulties appeared to her as medical, rather than purely psychological, in nature. *See id*. at 21; *cf. AR* at 452. In this regard, Defendant likewise makes no mention of this caveat in Dr. Snyder's assessment; instead, Defendant simply notes that "[t]he ALJ explained that [Dr. Snyder's] opinion was consistent with Plaintiff's reported symptoms and the ALJ's [own] observation of Plaintiff, supported in the medical record as a whole, consistent with Dr. Beam's 2014 assessment, and consistent with" a childhood evaluation of Plaintiff from 2012. *See* Def.'s Mot. (dkt. 23) at 13. Once again, the court disagrees, because to do otherwise would require the court to overlook Dr. Snyder's caution that her limitations opinion may lack context or a foundation, and that Plaintiff's cognitive difficulties may require a medical examination on which a medical opinion may be based. Second, it is incorrect for Defendant to suggest that Dr. Snyder's limitations opinion is 'consistent' with Dr. Beam's assessment of Plaintiff's limitations. As stated above, Dr. Beam opined that Plaintiff's symptoms require him to withdraw and isolate himself most of the time; on the other, hand, Dr. Snyder generally only found moderate limitations in most of Plaintiff's work-related abilities to function. Accordingly, because Dr. Snyder's opinion as to Plaintiff's mostly moderate limitations was accepted over the more restrictive opinion expressed by Dr. Beam – while incorrectly maintaining that they are "consistent" with one another – the court finds that the ALJ failed to provide specific and legitimate reasons based on substantial evidence for crediting Dr. Snyder's opinion, based on a "time-limited" single evaluation that even expressed some doubt

about its results, over Dr. Beam's opinion based on several months of treatment.

As to the fact that the ALJ gave "little weight to the unsupported examining opinion by Sonia Reyes-Tena, M.A., a Practicum Trainee under the supervision of Elizabeth Pearce, Psy.D." (*see AR* at 23), Defendant suggests that this opinion was properly given little weight because "the evaluator was not a treating source and the opinion was not supported by any treatment records." *See* Def.'s Mot. (dkt. 23) at 15. Defendant adds that Dr. Pearce's opinion is inconsistent with the record as a whole, by which Defendant means that it has sometimes been noted by nurses and doctors that Plaintiff seemed "alert and oriented" in 2013, or that he exhibited a "normal mood" at some point in 2014, or that he was noted as being "cooperative and friendly" on one occasion, and that he was "cooperative despite irritability" on another occasion. *See id*. at 15-16. Lastly, Defendant submits that Dr. Pearce's opinion was properly rejected as being internally inconsistent – however, the supposed 'inconsistency' is limited to Defendant wondering how Dr. Pearce could find that Plaintiff had marked limitations in understanding, remembering, or applying information if he "was [somehow] able to maintain concentration through testing sessions of three hours . . . [and] was able to understand and answer all questions asked." *Id*. at 16.

The court rejects each of these arguments in support of the ALJ's rejection of Dr. Pearce's opinion. First, the court will note that contrary to Defendant's suggestion, the evaluation was performed at a behavioral health and training center, and simply because a practicum trainee also signed the report, does not mean that it was Ms. Reyes-Tena's report as opposed to Dr. Pearce's report. Second, the above-discussed case authorities required the ALJ to give specific and legitimate reasons based on substantial evidence in order to reject Dr. Pearce's opinions. There is no merit to the suggestion that the rejection of Dr. Pearce's opinion was validly based on the fact that Dr. Pearce was an examining source and not a treating source; the standard for rejecting the contradicted opinion of a doctor is the same for examining and treating sources, and both require specific and legitimate reasons based on substantial evidence. *See Ghanim*, 763 F.3d at 1161; *see also Trevizo*, 871 F.3d at 675. Neither is there any merit to be found in the suggestion that Dr. Pearce's opinion was inconsistent with the record as a whole because Plaintiff sometimes seemed "alert and oriented" or "cooperative and friendly." Also, the court finds that there is no merit to the

16

argument that Dr. Pearce's opinions as to Plaintiff's limitations are in any way undermined by Plaintiff's ability to subject himself to diagnosis and testing. That Plaintiff was able to participate in psychological testing designed to identify the scope of his cognitive impairments does not mean that he has the wherewithal to function in the workplace, and to suggest otherwise would create an absurd result in that only persons unable to sit through a psychological evaluation would be deemed to be impaired beyond the moderate level. Lastly, as to Defendant's suggestion that another reason the ALJ validly rejected Dr. Pearce's opinion was because it was inconsistent with Dr. Snyder's opinion, as well as those of the non-examining state agency consultants (*see* Def.'s Mot. (dkt. 23) at 17); this does not constitute a specific and legitimate reason based on substantial evidence in the record for several reasons. First, Dr. Snyder's opinion was hedged, and Dr. Snyder expressly stated the need for a medical examination as to Plaintiff's cognitive difficulties, and therefore, the court finds that this prevents Dr. Snyder's opinion from constituting "substantial evidence" on its own such that the ALJ could base a wholesale rejection of Dr. Pearce's opinion on that foundation. Additionally, the opinions of the non-examining state agency consultants are not substantial evidence sufficient to justify the rejection of an examining doctor's opinion. *See Lester*, 81 F.3d at 830-31, 833; *see also Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990) ("non-examining physicians' conclusion[s], with nothing more" do not constitute substantial evidence controverting an examining physician's opinion.). Because Defendant has presented no persuasive arguments in support of the ALJ's rejection of Dr. Pearce's opinions, and also because the ALJ failed to state any specific and legitimate reasons based on substantial evidence, the court finds that the ALJ erred in giving little weight to Dr. Pearce's opinions.

Plaintiff also argues that the ALJ erred in using nothing more than boilerplate in rejecting his testimony to the effect that his symptoms cause him to isolate at home and not go anywhere "on a regular basis," because "he feels uncomfortable in crowds." *See* Pl.'s Mot. (dkt. 18) at 19. The ALJ decision made only a brief mention of Plaintiff's testimony in general terms. The ALJ rejected Plaintiff's testimony in two sentences by stating that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. The claimant's alleged symptoms and

17

limitations are not consistent with the record as a whole, which demonstrates . . . no ongoing treatment for . . . depression or Post-Traumatic Stress Disorder." *AR* at 21. Beyond this, the ALJ made no mention of Plaintiff's testimony. *See generally id*. at 15-26.

The assessment of a claimant's credibility regarding the intensity of symptoms requires an ALJ to engage in a two-step analysis. *See Ghanim*, 763 F.3d at 1163; *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). Initially, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ghanim*, 763 F.3d at 1163 (quoting *Vasquez*, 572 F.3d at 591). If the claimant satisfies the first test, and there is no evidence of malingering, the ALJ can then only reject a claimant's symptom testimony by giving specific, clear and convincing reasons for the rejection. *Ghanim*, 763 F.3d at 1163; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). General findings, therefore, will not suffice and an ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Ghanim*, 763 F.3d at 1163; *see also Lester*, 81 F.3d at 834. Here, because there was no evidence of malingering, the Plaintiff's testimony regarding the intensity of his symptoms could not be rejected without providing specific, clear and convincing reasons based on substantial evidence. The ALJ's two-sentence discussion fell short of that mark. First, the ALJ failed to specifically identify which portions of Plaintiff's testimony were being rejected as "not entirely consistent" with the record. Second, the ALJ failed to specifically identify what evidence undermines which part of Plaintiff's testimony. Lastly, the ALJ's reasoning that the record does not reflect ongoing treatment for PTSD is unclear and unconvincing, as the court can discern no logical reason that Plaintiff's testimony about his fear of leaving the house would be undermined by not having received "ongoing" treatment for PTSD. Accordingly, the court finds that the ALJ erred in rejecting Plaintiff's testimony by failing to provide specific, clear and convincing reasons for the rejection.

Turning to Plaintiff's claims touching on the RFC and the VE's testimony, Defendant correctly observes that "Plaintiff's disagreements with the ALJ's RFC finding and vocational expert testimony are derivative of his earlier disagreements with the ALJ's evaluation of the

18

medical opinions . . . and his testimony." *See* Def.'s Mot. (dkt. 23) at 17. Having found that the ALJ erred in rejecting the opinions of Dr. Beam and Dr. Pearce, as well as Plaintiff's testimony, the court also finds that the ALJ erred in formulating an RFC in this case that was not based on substantial evidence, as well as having erred in eliciting VE's testimony based on a series of incomplete hypotheticals.

Finally, as to the remedy sought for the above-described errors, Plaintiff has suggested that "the case should be remanded for further proceedings." Pl.'s Mot. (dkt. 18) at 22. The court agrees that further administrative proceedings would serve a useful purpose, and indeed are necessary. As mentioned, unless on remand the ALJ finds Plaintiff to be disabled based on the above-described evidence, which appears highly likely based on Dr. Pearce's report; it would, in the alternative, be incumbent on the ALJ to at least properly develop this record such as by contacting the treating and examining sources to ferret out the details of any disharmony between their opinions, or to reconvene the hearing and question Plaintiff in a more pointed and fruitful way such as to perhaps establish how often he feels he can leave the house or in what setting he might be able to function, or to order a psychiatric consultative examination as appeared to be suggested by Dr. Snyder. *See generally Tonapetyan*, 242 F.3d at 1150 ("The ALJ's duty to develop the record fully is [] heightened where the claimant may be mentally ill and thus unable to protect her own interests."). As to Plaintiff's argument that the ALJ in this case was not properly appointed; Defendant submits that if there existed any defect in the appointment process for ALJs, it has since been remedied. *See* Def.'s Mot. (dkt. 23) at 18. In any event, remedied or not, since the court is already remanding this case for further proceedings, any issues pertaining to an ALJ's status or power to hear a case can be appropriately raised and addressed in the first instance in that forum.

//
//
//
//
//
//

19

**CONCLUSION**

For the reasons stated above, the court **GRANTS** Plaintiff's motion for summary judgment, **DENIES** Defendant's motion for summary judgment, and **REMANDS** the case for further proceedings in accordance with the guidance provided herein.

A separate judgment will issue.

**IT IS SO ORDERED.**

Dated: September 25, 2019

ROBERT M. ILLMAN
United States Magistrate Judge